**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**CLINTON BLEVINS and
IRIS DELOIS BLEVINS,**

       Plaintiffs,

**v.**                               **CIVIL ACTION NO. 3:12-CV-134
(JUDGE GROH)**

**FLAGSTAR BANK, F.S.B, MONOCACY
HOME MORTGAGE, LLC,
DAN RYAN BUILDERS, INC., and
JAY KIMMEL,**

       Defendants.

<u>**ORDER GRANTING DEFENDANT DAN RYAN BUILDERS, INC.'S
MOTION TO COMPEL ARBITRATION**</u>

On February 12, 2013, Defendant Dan Ryan Builders, Inc. ("DRB") filed a Motion to Dismiss Plaintiffs' Complaint or in the alternative, Motion to Compel Arbitration [Doc. 28]. On February 26, 2013, Plaintiffs filed their response in opposition to DRB's motion. On March 5, 2013, DRB filed its reply. On May 16, 2013, the Court held an evidentiary hearing in this matter to hear the parties' arguments, listen to testimony, and receive evidence. Therefore, for the following reasons, the Court finds that Defendant Dan Ryan Builders, Inc.'s Motion to Compel Arbitration should be granted.

### I. Facts and Procedural History

The Court finds the following facts based upon the evidence and testimony presented at the final hearing.

Plaintiffs are a married couple residing in Charles Town, West Virginia. Mrs.

Blevins is a high school graduate.  She is currently a human resource professional.  In 2007, she had taken college classes for two partial years at Manassas NOVA, and she worked at La Strada International in Virginia, a company that operated and maintained the Dulles Greenway.  Her previous work experience also included typing contracts for a building contractor as an accounting clerk.  Mrs. Blevins testified that the contracts she worked with included arbitration provisions.  Additionally, the contracts were also pre-printed forms, and she would add in specifics such as the scope of work and the contractor's name.  Last, Mrs. Blevins stated she previously purchased one home.  Mrs. Blevins selected her first home and completed the purchase without the assistance of a realtor.

Mr. Blevins is also a high school graduate.  In 2007, he had attended some college classes.  Until February 2007, Mr. Blevins worked for Turner Construction Company where he was a safety manager/assistant superintendent.  He currently works for GDC Contracting in Manassas, Virginia where he is a superintendent that oversees earth work and infrastructure of the companies.  Mr. Blevins testified that he has thirty years of experience in the construction industry, and he has worked on both the commercial and residential side.

In 2007, Plaintiffs searched for a home for several months in Virginia and then in West Virginia.  When Plaintiffs turned their home search to West Virginia, Plaintiffs worked with Tracy Kable, a realtor in Charles Town, West Virginia, to find a home in the area.  Prior to entering into a contract with DRB, Plaintiffs viewed numerous properties in their home search, including existing construction and options to build in several subdivisions.  On January 17, 2007, Plaintiffs entered into an Agreement of Sale with

2

DRB agreeing to purchase from DRB a new residential home, located at 805 Leetown Road in Summit Point, West Virginia.  The contract price was $450,000.  The contract contained an arbitration provision at Paragraph 19 providing that

> Any dispute arising under or pursuant to this Agreement, or in any way related to the Property and/or with respect to any claims arising by virtue of any representations alleged to have been made by Us or any agents and/or employees thereof . . . shall be settled and finally determined by arbitration and not in a court of law, irrespective of whether or not such claim arises prior to or after Settlement hereunder . . . .

Def.'s Ex. 6, ¶ 19.  The home was appraised by Mr. Kimmel, and financed through Monocacy.  Flagstar, the holder of the Note secured by the property at issue, services the loan.

On January 17, 2007, Ms. Minoglio, the sales agent and realtor for Dan Ryan Builders Realty, Inc., met with Plaintiffs.  Plaintiffs had been referred to Ms. Minoglio by their real estate agent, Tracy Kable.  Ms. Minoglio and Plaintiffs visited two separate home sites: The Preserve at Barleywood and Summit Point.  After Plaintiffs selected their lot at Summit Point, Ms. Minoglio and Plaintiffs reviewed the various floor plans that were available.  Plaintiffs selected the Oxford floor plan.  Then, Ms. Minoglio reviewed all of the available options for their home.  Finally, she presented the contract to Plaintiffs.  Ms. Minoglio estimated that the entire process took hours and that the actual presentation of the contract took about an hour.  During this meeting, Plaintiffs also selected numerous options.  For example, Plaintiffs selected a three-car garage and recessed lighting.  Ms. Minoglio testified that Plaintiffs were engaged and interacted with each other during this process.  When Plaintiffs were selecting their options, they engaged in back-and-forth discussions with each other.  The Agreement of Sale

contained seven pages, not including addenda.  The contract was pre-printed with fill-in-the-blank provisions.  Although the written verbiage of the form contract could not be altered on the form, any changes or modifications to the contract would be made through addenda attached to the contract.

Plaintiffs testified that Ms. Minoglio simply printed out the contract, handed it to them page by page, and instructed them to sign each page.  Mrs. Blevins testified that Ms. Minoglio did not read the contract to them *word for word*.  Although Ms. Minoglio could not specifically remember reviewing the contract with Plaintiffs, she testified that, as in every meeting where she reviews a sales contract with potential buyers, it was her practice to paraphrase the paragraphs in the contract.  It was also her practice to ask potential buyers if they had any questions as she reviewed the contract.

Ms. Minoglio testified that she had a regular paraphrase she would use to explain each contract provision.  Ms. Minoglio stated it was her practice to review the incentives Plaintiffs would receive for using DRB's preferred lender and title company.  The incentives totaled $78,983.95 and $15,000 towards their closing costs.  Ms. Minoglio testified, however, that in the past purchasers have negotiated with DRB to use outside lenders and title companies and still receive the incentives.  Ms. Minoglio pointed out that the incentives in the contract, like anything else, can be negotiated.  Ms. Minoglio would also paraphrase the arbitration provision by stating that the purchasers agree to participate in arbitration if there was a disagreement with DRB before the purchasers would hire an attorney and attempt to sue DRB.  Additionally, Ms. Minoglio would paraphrase Paragraph 10, If You Default, as highlighting some of the actions DRB could take if purchasers defaulted.

4

At the time of signing the contract, Mrs. Blevins stated that her understanding of arbitration was that it was basically mediation, but an agreement would be binding on the parties.  Mr. Blevins testified that his understanding of mediation was the parties sit down and come up with a resolution.  Mr. Blevins stated that in handling other legal issues, he frequently would conduct research in a law library.  For example, he conducted his own legal research when handling a custody issue regarding his child and an easement issue regarding the subject property.  However, he never asked a representative of DRB, Ms. Minoglio, or his own real estate agent what arbitration meant.  Also, he never researched the definition of arbitration.

After Plaintiffs signed the contract, they also negotiated additional changes through numerous "change orders."  The change orders included adding an open oak staircase, ceramic tile to the laundry room, a walkout, and two decorative columns.  Plaintiffs also negotiated several structure wire options.  Plaintiffs clarified the type of faucets and the edging on their granite countertops.  Additionally, Plaintiffs negotiated with DRB twice to modify the amount of the down payment.  The first time, the original deposit was lowered from $13,000 to $11,000.  The second time, the down payment was lowered from $11,000 to $9,000.  Both changes were reflected in addenda to the contract.

As Plaintiffs' home was constructed, Plaintiffs took an active role in monitoring its progress.  On July 9, 2007, Mr. Blevins sent a letter to DRB listing issues with the house that needed to be resolved prior to closing or Plaintiffs would not sign the paperwork at settlement. Def.'s Ex. 4.  The following day, July 10, 2007, Mr. Blevins sent a follow up letter stating that if DRB could not come to an agreement with Plaintiffs and they chose

5

to follow through with arbitration, then DRB would need to forward to Mr. Blevins their legal counsel's firm name and address as well as their attorney's name and contact information.  Def.'s Ex. 3.  However, later that month, Plaintiffs closed on the property.

Additionally, during the construction of Plaintiffs' home at Summit Point, Plaintiffs contacted Ms. Minoglio about purchasing a home in The Preserve at Barleywood development as an investment property.  Ms. Minoglio testified that DRB offered an investment program where it would lease-back the property.  Mrs. Blevins stated that her and her husband discussed making an offer on the home, but never made an official offer.  However, Ms. Minoglio testified that Plaintiffs put an offer in on that home as well, but Plaintiffs' offer was not accepted as there was another offer that was higher.  During this process, Plaintiffs were again represented by their own real estate agent, Tracy Kable.

Finally, Plaintiffs filed their Complaint in the Circuit Court of Jefferson County on October 9, 2012 against multiple defendants.  Plaintiffs filed suit against the Seller of their home at Summit Point, DRB; the primary lender, Monocacy; the appraiser who conducted the appraisal for the loan transaction at issue, Jay Kimmel; and the loan servicer, Flagstar.  Defendant Flagstar, with the consent of all co-defendants, removed to this Court on November 13, 2012, on the basis of diversity jurisdiction.

## II.  Legal Standard under the Federal Arbitration Act

The Federal Arbitration Act ("FAA") applies to "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . ." **9 U.S.C. § 2**.  The FAA reflects "a liberal

6

federal policy favoring arbitration agreements." ***Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.***, 460 U.S. 1, 24, 103 S. Ct. 927 (1983).  This policy is supported by Congress's view that arbitration constitutes a more efficient dispute resolution process than litigation. ***Hightower v. GMRI, Inc.***, 272 F.3d 239, 241 (4th Cir. 2001). Therefore, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." ***Adkins v. Labor Ready, Inc.***, 303 F.3d 496, 500 (4th Cir. 2002).

A district court also applies "the federal substantive law of arbitrability, which governs all arbitration agreements encompassed by the FAA." *Id.* (citations omitted). However, a district court applies ordinary state law principles governing the formation of contracts, "including principles concerning the 'validity, revocability, or enforceability of contracts generally.'" ***Muriithi v. Shuttle Exp., Inc.***, 712 F.3d 173, 179 (4th Cir. 2013) (citations omitted).  Section 2 of the FAA provides that arbitration agreements may be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." **9 U.S.C. § 2**.  "This savings clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." ***AT&T Mobility LLC v. Concepcion***, __ U.S. ___, 131 S. Ct. 1740, 1746 (2011) (quoting ***Doctor's Assoc., Inc. v. Casarotto***, 517 U.S. 681, 687, 116 S. Ct. 1652 (1996)).

To compel arbitration under the FAA, the Fourth Circuit held that a moving party must "demonstrate '(1) the existence of a dispute between the parties, (2) a written

agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.'" *Adkins*, 303 F.3d at 500-01 (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)).  "Under the FAA, courts must stay any suit 'referable to arbitration' under an arbitration agreement, where the court has determined that the agreement so provides, and one of the parties has sought to stay the action." *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 604 (4th Cir. 2013) (citing **9 U.S.C. § 3**).

### III.  Discussion

DRB's motion to compel arbitration is based upon the following arbitration clause contained in the Contract:

**19. ARBITRATION**.

(a) Any dispute arising under or pursuant to this Agreement, or in any way related to the Property and/or with respect to any claims arising by virtue of any representations alleged to have been made by Us, or any agents and/or employees thereof, (with the exception of "Consumer Products" as defined by the Magnuson-Moss Warranty Federal Trade Commission Improvements Act, 15 U.S.C. Section 2301 et seq. and the regulations promulgated thereunder) shall be settled and finally determined by arbitration and not in a court of law, irrespective of whether or not such claim arises prior to or after Settlement hereunder, pursuant to the Construction Industry Arbitration Rules and the Supplementary Procedures for Residential Construction Disputes of the American Arbitration Association ("AAA") then in effect.  Prior to commencing arbitration, the dispute shall first be mediated in accordance with the Construction Industry Mediation Rules of AAA, or another mediation service designated by Us.  The parties hereto specifically acknowledge that they are and shall be bound by arbitration and are barred from initiating any proceeding or action whatsoever in connection with this Agreement.  Notwithstanding anything to the contrary herein contained, in the event You default by failing to settle on the Property within the time required under this Agreement, then We may either (i) commence an

8

arbitration proceeding under this Section 19, or (ii) bring an action for its damages, including reasonable attorneys' fees, as a result of the default in a court having jurisdiction over the Purchaser.  You expressly waive your right to mediation and arbitration in such event.  Each party shall be entitled to full discovery in accordance with the local rules of court in the event that arbitration is invoked under this Section 19.  The provisions of this Section 19 shall survive the execution and delivery of the deed, and shall not be merged therein.

(b) In the event that an action is brought in court under Section 19(a) or for any reason a claim is determined not to be subject to binding arbitration under Section 19(a), then You and Us knowing and voluntarily waive our rights to a trial by jury in any action, proceeding or counterclaim related to this Agreement or the Property, including such actions, proceedings or counterclaims in which You and Us as well as others are parties.

Def.'s Ex. 6, ¶ 19.

## A.  All Four Elements Exist for Compelling Arbitration

As outlined above, for DRB to compel arbitration it must "demonstrate '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.'" *Adkins*, 303 F.3d at 500-01 (quoting *Whiteside*, 940 F.2d at 102).

### 1.  Dispute Exists Between the Parties

The first element is easily satisfied.  DRB readily identified the existence of a dispute between the parties as Plaintiffs filed suit against DRB in Jefferson County Circuit Court for alleged defects in the construction of their home.

### 2.  Written Agreement Includes an Arbitration Provision which Purports to Cover the Dispute

The second element is also satisfied.  The contract between Plaintiffs and DRB

9

contains an arbitration provision at Paragraph 19 that purports to cover the dispute. The Fourth Circuit recognized that a court "may not deny a party's request to arbitrate an issue 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92 (4th Cir. 1996) (citing *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83, 80 S. Ct. 1347, 1353 (1960)).   The arbitration clause is very broad and covers "[a]ny dispute arising under or pursuant to this Agreement, or in any way related to the Property and/or with respect to any claims arising by virtue of any representations alleged to have been made by [DRB] . . . ."  Def.'s Ex. 6, ¶ 19.

Plaintiffs' Complaint alleged the Defendants, including DRB, engaged in predatory lending practices to make an unfair loan based on *seller* misrepresentations and lender misrepresentations, fraudulent incentives, and an inflated appraisal.  DRB's alleged misrepresentations regarding the value of Plaintiffs' home and fraudulent incentives arise under or pursuant to the contract entered into by Plaintiffs and DRB for the construction of Plaintiffs' home.

### 3.  The Transaction is Related to Interstate or Foreign Commerce

Plaintiffs argue that the transaction is not related to interstate commerce.  The United States Supreme Court "interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'-words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56, 123 S. Ct. 2037 (2003)

(quoting *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273-74, 115 S.

Ct. 834 (1995)).  The Court noted that "the statute provides for 'the enforcement of

arbitration agreements within the full reach of the Commerce Clause,' therefore, it is

perfectly clear that the FAA encompasses a wider range of transactions than those

actually 'in commerce'-that is, 'within the flow of interstate commerce.'" *Id.* (internal

quotation marks, citation, and emphasis omitted).

In this case, the contract, at the time it was entered into, was between citizens of

two different states as DRB was a Maryland corporation and Plaintiffs were Virginia

residents.  The parties entered into a contract for construction of a home that was built

with materials transported in interstate commerce. *See EQT Corp. v. Miller*, Civil Action

No. 1:11CV197, 2012 WL 3839417, at *2 (N.D. W. Va. Sept. 5, 2012) (finding

agreement related to interstate commerce because "the parties to the [a]greement

[were] citizens of two different states and the work performed under the relevant

employment relationship involved a product which is largely commercially transported

and sold in interstate commerce.").  Additionally, the agreement affected interstate

commerce because the materials utilized in the construction of the Plaintiffs' home

traveled through channels of interstate commerce.  Therefore, the contract involved

interstate commerce, and the third element is satisfied.

### 4.  Plaintiffs Failed to Arbitrate the Dispute

The final element is readily satisfied.  Plaintiffs failed and refused to arbitrate the

dispute by filing the suit in Jefferson County Circuit Court rather than attending

arbitration.

**B.  "The Savings Clause": No Adequate Defense Exists to Prevent Enforcement of the Arbitration Clause**

Plaintiffs argue that the Court should deny DRB's Motion to Compel Arbitration because the arbitration clause is unconscionable.  Plaintiffs contend that they are unsophisticated consumers and that DRB is a large, sophisticated corporation. Plaintiffs also argue that the contract provided DRB with a court forum, but did not provide Plaintiffs with such a remedy.

Section 2 of the FAA permits courts to invalidate arbitration agreements using general contract principles. *See* **9 U.S.C. § 2**.  "This savings clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." ***AT&T Mobility LLC***, __ U.S. ___, 131 S. Ct. at 1746; *see also* Syl. Pt. 6, ***Brown v. Genesis Healthcare Corp.***, 724 S.E.2d 250 (W. Va. 2011) (***Brown I***) overruled on other grounds by ***Marmet Health Care Ctr., Inc. v. Brown***, __ U.S. __, 132 S. Ct. 1201 (2012) ("Under the [FAA], 9 U.S.C. § 2, a written provision to settle by arbitration a controversy arising out of a contract that evidences a transaction affecting interstate commerce is valid, irrevocable, and enforceable, unless the provision is found to be invalid, revocable, or unenforceable upon a ground that exists at law or in equity for the revocation of any contract.").

On certified question from the Fourth Circuit, the West Virginia Supreme Court of Appeals noted that parties frequently challenge the enforceability of arbitration clauses on the ground that the clauses lack consideration or lack equivalent promises. ***Dan***

12

*Ryan Builders, Inc. v. Nelson*, 737 S.E.2d 550, 558 (W. Va. 2012).  The Court held that "the formation of a contract with multiple clauses only requires consideration for the entire contract, and not for each individual clause."   *Id.*  Thus, a single clause within a multi-clause contract does not require separate consideration.

However, the West Virginia Supreme Court of Appeals further concluded that "under the doctrine of unconscionability, a trial court may decline to enforce a contract clause—such as an arbitration provision—if the obligations or rights created by the clause unfairly lack mutuality." *Id.*   Therefore, lack of mutuality of obligation in the formation of a contract is "a factor for a court to consider when assessing whether a contract (or provision therein) is unconscionable."  *Id.*

"Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."  *Brown v. Genesis Healthcare Corp.*, 729 S.E.2d 217, 226 (W. Va. 2012) ("*Brown II*").  Under West Virginia law, courts "analyze unconscionability in terms of two component parts: procedural unconscionability and substantive unconscionability."  *Nelson*, 737 S.E.2d at 558 (quoting *Brown I,* 724 S.E.2d at 285).  In establishing procedural unconscionability, courts look at "inequities, improprieties, or unfairness in the bargaining process and the formation of the contract, inadequacies that suggest a lack of a real and voluntary meeting of the minds of the parties."  *Nelson*, 737 S.E.2d at 558.  In assessing the substantive unconscionability, a court may look to the "unfairness in the terms of the contract itself, and arises when a contract term is so one-sided that it has an overly

13

harsh effect on the disadvantaged party." *Id.* In the substantive unconscionability analysis, lack of mutuality in a contractual obligation is a proper element to consider. *Id.* Therefore, "[i]f a provision creates a disparity in the rights of the contracting parties such that it is one-sided and unreasonably favorable to one party, then a court may find the provision is substantively unconscionable." *Id.*

### 1. Procedural Unconscionability

Plaintiffs argue that the contract is procedurally unconscionable because the contract was one of adhesion. Plaintiffs contend that the contract was a form contract offered on a "take-it-or-leave-it" basis.

Procedural unconscionability requires "gross inadequacy in bargaining power." *Adkins*, 303 F.3d at 502 (quoting *Troy Mining Corp. v. Itmann Coal Co.*, 346 S.E.2d 749, 753 (W. Va. 1986)). The West Virginia Supreme Court of Appeals set forth the following guidelines for determining procedural unconscionability:

> Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract. Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction. These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract.

Syl. Pt. 17, *Brown I*.

*First*, Plaintiffs argue that the Agreement of Sale is a contract of adhesion and thus procedurally unconscionable. West Virginia's Supreme Court of Appeals defines adhesion contracts as "all 'form contracts' submitted by one party on the basis of this or

14

nothing." *State ex rel. Dunlap v. Berger*, 567 S.E.2d 265, 273 (W. Va. 2002) (citations omitted).  "Procedural unconscionability often begins with a contract of adhesion." *State ex rel. Richmond Am. Homes of W. Va., Inc. v. Sanders*, 717 S.E.2d 909, 921 (W. Va. 2011).  However, "[f]inding that there is an adhesion contract is the beginning point for analysis, not the end of it; what courts aim at doing is distinguishing good adhesion contracts which should be enforced from bad adhesion contracts which should not."  *Id.* (quoting *State ex rel. Dunlap*, 567 S.E.2d 265).   The West Virginia Supreme Court cautioned that although adhesion contracts include all form contracts submitted by one party on the basis of this or nothing, "[s]ince the bulk of contracts signed in this country, if not every major Western nation, are adhesion contracts, a rule automatically invalidating adhesion contracts would be completely unworkable." *Pingley v. Perfection Plus Turbo-Dry, LLC*, __S.E.2d__, 2013 WL 1788224 (W. Va. Apr. 10, 2013).

     Plaintiffs assert that the Agreement of Sale they entered into with DRB was a form contract, and its terms could not be altered.  Therefore, Plaintiffs contend the Agreement of Sale is an adhesion contract.   DRB admits that the Agreement of Sale is a pre-printed contract with fill-in-the blank provisions.  However, Ms. Minoglio, Dan Ryan Builders' Realty Inc.'s sales agent that assisted Plaintiffs with purchasing their home, testified that although purchasers could not change the verbiage in the contract, changes to the contract were permitted by attaching an addendum.  Therefore, there was room for negotiation of the terms of the contract.  In fact, Plaintiffs admit that they selected the lot, the model of the house, the various options for the house and

negotiated the price of the home and reductions in the down payment.  Plaintiffs

negotiated with DRB throughout the entire process as Plaintiffs made various changes

to their home even up to the month of closing.

Additionally, Plaintiffs provide no evidence that there were no meaningful

alternatives to signing the Agreement of Sale with DRB.  Indeed, Plaintiffs were free to

seek the services of another homebuilder, as DRB is not the only residential builder in

operation in the Berkeley County and Jefferson County area of West Virginia.  *See*

***Ciampi v. Dan Ryan Builders, Inc.***, Civ. Action No. 3:10-CV-55 (N.D.W. Va. July 15,

2010) (noting that "DRB is not the only residential builder in operation in Berkeley

County, West Virginia"); *see also* **Saturn Dist. Corp. v. Williams**, 905 F.2d 719, 727

(4th Cir. 1990) ("[T]he mere fact that Saturn requires dealers to agree to its arbitration

provisions in order to obtain a Saturn dealership does not make its Dealership

Agreement non-consensual.  If a dealer does not wish to agree to non-negotiable

arbitration provisions, the dealer need not do business with Saturn.").  Also, Plaintiffs

admit they were represented by a realtor during their search for a home and that they

looked at existing construction as well as other builders in various subdivisions.

However, after seeing numerous properties over a few months, Plaintiffs finally selected

DRB and a lot at Summit Point to build and purchase a new home.

Plaintiffs have not stated that DRB's arbitration provisions was a non-negotiable

term.  In fact, there is nothing to suggest to this Court that Plaintiffs attempted to alter or

opt-out of the provision.  Although the form was a fill-in-the-blank contract, the parties

negotiated over the terms to fill in the blank, including the price and other details

16

regarding the construction of the home.  Therefore, this was not a contract of adhesion as terms could be negotiated and modified and there were other meaningful alternatives as Plaintiffs were free to seek the services of another homebuilder.

*Second*, Plaintiffs argue that the manner and setting in which the contract was formed resulted in a gross inadequacy in bargaining power.  Mrs. Blevins stated that in reviewing the Agreement of Sale, they were simply handed pages to sign by DRB's Sales Agent, and Ms. Mingolio did not review the contract word for word.  However, Ms. Minoglio stated that she remembered meeting with Plaintiffs, and her usual practice was to explain the terms of the contract to the purchasers.  Ms. Minoglio testified that she would not read the purchase agreement line by line or word for word, but she would paraphrase the contract's provisions.  Ms. Minoglio stated that she would review each page of the contract with the purchasers.  After the page was reviewed, the purchasers would sign and date the bottom.  She also encouraged the purchasers to ask questions throughout the process.  Ms. Minoglio testified that she has followed this procedure since she began working for Dan Ryan Builders Realty, Inc. over nine years ago.  In meeting with Plaintiffs, Ms. Minoglio testified that it took about an hour to review the seven page Agreement of Sale and create and review the addenda for the contract.

Throughout the process, testimony from Plaintiffs and Ms. Minoglio indicated that there was back and forth discussion between the parties.  Specifically, Plaintiffs were engaged in the process of selecting the model, floor plans, and options for their home. In fact, Plaintiffs continued to negotiate with Dan Ryan Builders even after the Agreement of Sale was executed.  Plaintiffs completed multiple change orders to their home, such as adding an open oak stair case and forcing a walkout.  They clarified the

type of faucets they selected and the edging on their granite countertops.  Also after signing the contract, Plaintiffs twice negotiated with DRB to modify the amount of the down payment.  The first time, the original deposit was lowered from $13,000 to $11,000.  The second time, the down payment was lowered from $11,000 to $9,000.  Both changes were reflected in addenda to the contract.

Plaintiffs also fail to present any evidence of deception or compulsion on the part of DRB.  Plaintiffs make no allegation of deception.  With regard to compulsion, there were no high-pressure sales environments.  When Plaintiffs were negotiating the Agreement of Sale, no executives or supervisors from Dan Ryan Builders were present.  In fact, no one from DRB was present other than Ms. Minoglio as a real estate agent for DRB, a fact which she fully disclosed to Plaintiffs. *See* Def.'s Ex. 6.  In June 2007, one month before closing, Plaintiffs submitted a change order and faxed it from Mrs. Blevins' employment location–indicating that negotiations were done over a period of time and in low pressure environments.  Additionally, a few weeks prior to closing, Plaintiffs sent a letter to DRB threatening that they would not close on the house until a list of issues were resolved.  Def.'s Ex. 4.  As evidenced from this letter, Plaintiffs were bargaining with and presenting ultimatums to DRB.  This does not indicate gross inadequacy in bargaining power.

***Third***, Plaintiffs contend that there were hidden and unduly complex contract terms in the Agreement of Sale.  Although Ms. Minoglio admitted that the Agreement of Sale is a somewhat complex document, she also stated that it is a typical builder agreement of sale that would be similar to any other builder's agreement.  She also pointed out that, like any legal document, it has verbiage that may seem complex.  In

18

reviewing Plaintiffs' and Ms. Minoglio's testimony, the Court does not find that the contract terms in the Agreement of Sale were hidden or unduly complex.

As explained above, the terms of the contract were not hidden. Ms. Minoglio testified that it was her usual business practice to paraphrase the terms of the contract, including the arbitration provision at Paragraph 19. Indeed, the title of the paragraph was in all capital letters with a bold typeface. The title "**ARBITRATION**" was offset from the surrounding text. Plaintiffs signed directly below the arbitration provision. Ms. Minoglio also testified it was her business practice to review and paraphrase Paragraph 10, If You Default. This term was also obvious as it was in all capital letters with a bold typeface and offset from the surrounding text. Plaintiffs also signed on the bottom of that page. Additionally, the arbitration provision was not buried within a lengthy document. Rather, the contract was only seven pages.

Not only were the terms not hidden, but they were also not unduly complex. At the hearing, Mrs. Blevins testified as to her understanding of arbitration at the time of signing the Agreement of Sale. She explained that her understanding of arbitration was that it was basically mediation, except an agreement was binding. Mrs. Blevins' definition of arbitration is an adequate definition and understanding of arbitration. She stated she came up with that understanding based on her previous experience with contracts. In fact, Mrs. Blevins testified that she would type form contracts for a building contractor, and she routinely observed arbitration clauses in their contracts.

The arbitration provision in the contract also explained the process to the parties. First, the provision explained that any claims arising from the contract or by virtue of alleged representations "shall be settled and finally determined by arbitration and not in

19

a court of law." Second, the provision stated that before "commencing arbitration, the dispute shall first be mediated." This highlighted that there was a difference between mediation and arbitration. Last, the provision states that the parties "specifically acknowledge that they are and shall be bound by arbitration and are barred from initiating any proceeding or action whatsoever in connection with this Agreement." This emphasizes that arbitration is a binding process, and that parties are prohibited from initiating other proceedings or actions. Therefore, the arbitration provision in the contract provides some explanation of the process.

Plaintiffs also threatened to take DRB to arbitration. In Defendant's Exhibit Number 3, Plaintiffs wrote a letter to DRB stating that if they could not "come to an agreement on the issues with the house, and Dan Ryan Builders chooses to follow through with arbitration, [Mr. Blevins] will need [DRB] to forward [them] Dan Ryan Builder's legal counsel's firm name and address, attorney's name, and a contact number." Def. Ex. 3. This letter was sent on July 10, 2007, which was *prior* to closing. Therefore, Plaintiffs were aware of the arbitration provision before they closed on the property.

**Fourth**, Plaintiffs concede that there was no inadequacy regarding their age or literacy; however, in Plaintiffs' response, they argue that "the relative sophistication of the parties to the sales agreement was not at all equal." In fact, the Court finds, based on the testimony, that Plaintiffs were relatively sophisticated parties in this transaction. At the time of signing the contract, Mrs. Blevins was a high school graduate and had taken a few college courses at Manassas NOVA. She is a human resource professional, and in 2007 at the time of entering into the purchase agreement, she

worked at La Strada International in Virginia, which operated and maintained the Dulles

Greenway.  She previously worked with contracts and arbitration clauses as an

accounting clerk for a building contractor, and she was familiar with arbitration

provisions in construction contracts.  Mrs. Blevins is also familiar with purchasing a

home.  She previously purchased and owned a home in Manassas, Virginia, and she

even navigated the purchase without the assistance of a real estate agent.

At the time of signing the Agreement of Sale, Mr. Blevins was also a high school

graduate, and he had taken a few college courses at Manasses NOVA over a two year

period.  Mr. Blevins also testified that when he encountered legal issues, such as

custody proceedings for his son and an easement issue on the current property, he

would go to a library and read legal books to assist him in understanding legal issues.

Until February 2007, Mr. Blevins was employed by Turner Construction Company.  He

was a safety manager/assistant superintendent.  Currently, Mr. Blevins is employed by

GDC Contracting, an earth works company in Manassas, Virginia.  He is a

superintendent and oversees the earth work and infrastructure of the companies.  Mr.

Blevins has been in the construction industry for thirty years.  He has worked in both

commercial and residential construction.  Throughout the construction of his new home,

he monitored its progress.

Plaintiffs' age, literacy, education, and training are significant.  Plaintiffs are not

elderly.  *Compare* ***Arnold v. United Cos. Lending Corp.***, 511 S.E.2d 854 (W. Va.

1998) (finding an agreement unconscionable based upon predatory lending because

United Lending was a national lending institution and the Arnolds were elderly,

uneducated consumers), *overruled on other grounds by* ***Nelson***, 511 S.E.2d 854 .

21

Also, Plaintiffs are high school graduates with some college education and years of experience in the construction industry.  *Compare* ***State ex rel. Saylor v. Wilkes***, 613 S.E.2d 914 (W. Va. 2005) (weighing an employee's "tenth grade education" in favor of finding an employee agreement unenforceable).  Plaintiffs did not allege that they were illiterate or unable to read the contract.  Plaintiffs also had the opportunity to review the contract containing the arbitration provision after they signed the contract and prior to closing as Plaintiffs were provided with a copy of the contract.  Plaintiffs failed to identify any conduct on the part of Ms. Minoglio that prevented them from reading and reviewing the contract.  Plaintiffs concede that neither she nor her husband asked Ms. Minoglio to explain the contract or the arbitration provision or requested additional time to review the contract prior to signing.

In reviewing all the circumstances, Plaintiffs have failed to demonstrate a gross inadequacy in bargaining power suggesting a lack of real and voluntary meeting of minds.  Plaintiffs' age, literacy, and sophistication in the construction industry, the lack of hidden or unduly complex terms in the contract, and the manner and setting of executing the contract demonstrate that Plaintiffs had a reasonable opportunity to understand the terms of the contract. Therefore, in light of all the facts, the Court does not find the contract was procedurally unconscionable.  Although West Virginia law requires a finding of "both 'gross inadequacy in bargaining power' and 'terms unreasonably favorable to the stronger party,'" this Court will also explain why it does not find substantive unconscionability. ***Adkins***, 303 F.3d at 502 (quoting ***Troy Mining Corp.***, 346 S.E.2d at 753 (internal citations omitted)).

## 2. Substantive Unconscionability

Plaintiffs argue that the arbitration provision should not be enforced because it is substantively unconscionable as the obligations and rights created by the clause unfairly lack mutuality.  The West Virginia Supreme Court of Appeals explained that "[s]ubstantive unconscionability involves unfairness in the contract itself–'overall imbalance, one-sidedness, *laesio enormis*, and the evils of the resulting contract'–and whether a contract term has 'overly harsh or one-sided results' or is 'so one-sided as to lead to absurd results.'" ***Brown I***, 724 S.E.2d at 287 (internal citations omitted).  Courts must focus their inquiry on "whether the [contract] term is one-sided and will have an overly harsh effect on the disadvantaged party. To determine substantive unconscionability, courts have focused on vague matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Id.* (internal citations omitted).  "Substantive unconscionability may manifest itself in the form of an agreement requiring arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party." ***Brown II***, 729 S.E.2d at 228.  Therefore, lack of mutuality of obligation is "a factor for a court to consider when assessing whether a contract (or provision therein) is unconscionable." ***Nelson***, 737 S.E.2d at 558.

In this case, Plaintiffs primarily argue that the contract is unconscionable because it lacks mutuality of obligation.  Paragraph 10 of the Agreement of Sale provides "If You default, We may elect to do any one or more of the following: . . . pursue any other legal or equitable right or remedy." Def.'s Ex. 6, ¶ 10.  Plaintiffs

characterize the provision as allowing DRB to take Plaintiffs to court on any issue while Plaintiffs must arbitrate any issue.  Upon reviewing the relative remedies of the parties, the Court finds that the arbitration provision at Paragraph 19 and the default provision at Paragraph 10 are commercially reasonable.  Although DRB is permitted to seek a remedy from the courts if Plaintiffs default, this is a narrow remedy.  Essentially, the only instance when DRB may go to court rather than arbitration is to enforce the Agreement of Sale  in the event of default.  For every other issue arising out of the contract, DRB must go to arbitration.  *See **Miller v. Equifirst Corp. of W. Va.**, Civil Action No. 2:00-0335, 2006 WL 2571634, at *11 (S.D.W. Va. Sept. 5, 2006) (finding an agreement was not so one-sided as to be unconscionable where the lender defendants retained access to a judicial forum for foreclosure and bankruptcy proceedings, but were required to arbitrate all other claims).  Therefore, the contract term is not so one-sided as to have an overly harsh effect on Plaintiffs.  Additionally, this Court, as evidenced by the procedural unconscionability analysis, does not find that there is a gross inadequacy in bargaining power as Plaintiffs are sophisticated consumers with higher levels of education and training.  Taking into account Plaintiffs' bargaining position when reviewing the contract, the Court does not find that the terms unreasonably favor DRB as to make the contract unconscionable.

However, Plaintiffs, although they testified Ms. Minoglio did not review the terms in the contract, point out that Ms. Minoglio did not fully comprehend the meaning of arbitration when she was paraphrasing the arbitration provision.  Ms. Minoglio admitted in court that she subjectively understood the provision to mean if the arbitration was not successful, the purchasers could sue DRB.  However, Ms. Minoglio testified that she

24

would paraphrase the arbitration provisions as the purchasers agree to participate in arbitration if there was a disagreement with DRB before they would hire an attorney and attempt to sue DRB.  There was no testimony that Plaintiffs relied on–or were even aware of–Ms. Minoglio's subjective understanding of the meaning of arbitration.  Indeed, Plaintiffs did not ask any questions requesting Ms. Minoglio to explain Paragraph 19 or arbitration.  In fact, Mr. Blevins admits he never really paid attention to the arbitration provision in the contract.  Therefore, there is no evidence that Ms. Minoglio's subjective understanding of the term "arbitration" impacted Plaintiffs' own understanding of the term.

In sum, considering the totality of the circumstances in this case, Plaintiffs have failed to demonstrate that the contract and its terms were so unfair that it resulted in an overall imbalance or one-sidedness of the contract.  Therefore, the Court does not find substantive unconscionability.

### C.       Compelling Defendants to Arbitration

Plaintiffs filed their Complaint against four defendants: Flagstar, Monocacy, DRB, and Jay Kimmel.  Plaintiffs only entered into an arbitration agreement with DRB through the Agreement of Sale.  However, all Defendants consent to arbitration of their claims. Plaintiffs argue that although their claims against Jay Kimmel and Monocacy may be sent to arbitration, the claims against Flagstar are not subject to arbitration.

As a general principle, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which it has not agreed to arbitrate." ***R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n***, 384 F.3d 157, 160 (4th Cir. 2004)

(internal quotation marks omitted).  However, "[i]t is well-established . . . that a nonsignatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the nonsignatory despite the fact that the signatory and nonsignatory lack an agreement to arbitrate." ***Am. Bankers Ins. Group, Inc. v. Long***, 453 F.3d 623, 627 (4th Cir. 2006).

In this case, Defendants argue that the theory of equitable estoppel applies to compel Plaintiffs and all Defendants to arbitration.  There are two circumstances when equitable estoppel allows a nonsignatory to compel arbitration: (1) "when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory" and (2) "when the signatory raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." ***Brantley v. Republic Mortg. Ins. Co.***, 424 F.3d 392, 395-96 (4th Cir. 2005) (internal quotations and citation omitted).  The Fourth Circuit Court of Appeals stated that "at a minimum, there must be allegations of coordinated behavior between a signatory and a nonsignatory defendant, and that the claims against both the signatory and nonsignatory defendants must be based on the same facts, be inherently inseparable, and fall within the scope of the arbitration clause." ***Aggarao v. MOL Ship Mgmt. Co., Ltd.***, 675 F.3d 355, 374 (4th Cir. 2012) (internal citations and quotations omitted).

The West Virginia Supreme Court of Appeals has applied equitable estoppel as a basis for enforcing a forum selection clause against signatories and nonsignatories to a contract.  *See* ***Caperton v. A.T. Massey Coal Co., Inc.***, 690 S.E.2d 323, 347 (W. Va.

2009) ("In order for a non-signatory to benefit from or be subject to a forum selection clause, the non-signatory must be closely related to the dispute such that it becomes foreseeable that the non-signatory may benefit from or be subject to the forum selection clause.") (noting cases applying equitable estoppel to bind a nonparty of a contract to the contract's arbitration or forum selection clause).  Additionally, arbitration clauses have been recognized as a form of a forum selection clause. ***Holmes v. Chesapeake Appalachia, LLC***, Civil Action No. 5:11-cv-123, 2012 WL 3647674, at *12 (N.D.W. Va. Aug. 23, 2012).

### 1.  Claims Against Jay Kimmel

Plaintiffs' Complaint alleges six claims against the appraiser, Jay Kimmel.  Count One alleges that Kimmel accepted a fee contingent upon a predetermined conclusion.  Count Two alleges that Kimmel, in making the false appraisal, engaged in dishonesty, fraud, and misrepresentation and breached professional standards.  Count Three alleges that Kimmel failed to exercise ordinary care in conducting the appraisal.  Counts Six, Seven, and Eight are claims directed against DRB, Kimmel, and Monocacy for illegal and unconscionable inducement, fraud, and joint venture and agency.

In reviewing Plaintiffs' claims against Kimmel, it is apparent that their claims partially rely upon the contract in which the arbitration provision is found as Plaintiffs claim that Kimmel fraudulently inflated the appraisal price to match the price in the underlying contract.  However, most persuasively, Plaintiffs allege that Kimmel, a nonsignatory to the contract, engaged in coordinated behavior with DRB, a signatory of the contract, to fraudulently inflate the appraisal.  Plaintiffs, in their Supplemental

Memorandum Opposing Compelled Arbitration Against Non-Signatories to Arbitration Agreement, acknowledge that if the arbitration provision is not unconscionable, then Plaintiffs may be compelled to arbitrate their claims against Kimmel.  Therefore, Plaintiffs are equitably estopped from arguing that Kimmel was not a signatory to the arbitration clause because Plaintiffs' individual causes of action against Kimmel in their underlying complaint rely on the contract containing the arbitration clause and raise allegations of substantially interdependent and concerted misconduct by Kimmel and DRB.

### 2.  Claims Against Monocacy

Plaintiffs' Complaint alleges five claims against their lender, Monocacy.  Count Four alleges that Monocacy violated West Virginia Code § 31-17-8(m)(8) by making a loan to Plaintiffs so that the principal amount of it and the second loan made by BB&T on the same day at the same closing, exceeded the fair market value of the property that secured the loan.  Count Four also alleges that Monocacy was engaged in a joint venture or agency with Kimmel, or induced him to perform an inaccurate appraisal. Count Five alleges that Monocacy violated West Virginia Code § 31-17-8 by compensating, coercing and/or intimidating Kimmel, an appraiser, for the purpose of influencing his independent judgment with respect to the value of the real estate that was being offered as security for the loan. Counts Six, Seven, and Eight are claims directed against DRB, Kimmel, and Monocacy for illegal and unconscionable inducement, fraud, and joint venture and agency.

Plaintiffs' claims against Monocacy also rely upon the contract in which the arbitration provision is found.  Without the underlying contract, Monocacy would not

have provided a loan.  Additionally, Monocacy was listed as the preferred lender in the contract, and Plaintiffs received incentives based on obtaining their financing through Monocacy.  Plaintiffs' claims also allege concerted misconduct, specifically that Monocacy was either engaged in a joint venture with Kimmel and DRB or that Monocacy induced Kimmel to provide an inflated appraisal.  Plaintiffs, in their supplemental memorandum, acknowledge that if the arbitration provision is not unconscionable, then Plaintiffs may be compelled to arbitrate their claims against Monocacy.  Therefore, Plaintiffs are equitably estopped from arguing that Monocacy was not a signatory to the arbitration clause because Plaintiffs' individual causes of action against Moncacy in their underlying complaint rely on the contract and raise allegations of substantially interdependent and concerted misconduct by Monocacy, a nonsignatory to the contract, and DRB, a signatory.

### 3. Claims Against Flagstar

Plaintiffs' Complaint alleges one claim against Defendant Flagstar.  Count Nine of Plaintiffs' Complaint alleges that Flagstar violated the West Virginia Consumer Credit and Protection Act by communicating with Plaintiffs when it appeared that they were represented by an attorney.  Plaintiffs argue that their claims against Flagstar cannot be forced to arbitration because the numerous West Virginia Credit and Consumer Protection Act violations alleged against Flagstar are completely unrelated to the contract between Plaintiffs and DRB.  However, Flagstar argues that it should be included in the arbitration proceeding (1) because it is an intended third-party beneficiary to the contract and (2) because DRB and Monocacy have cross-claims against Flagstar such that fairness and judicial economy favor arbitration inclusive of all

29

parties to the action.

A third-party beneficiary of a contract is defined in West Virginia Code § 55-8-12, which states:

> If a covenant or promise be made for the *sole* benefit of a person with whom it is not made, or with whom it is made jointly with others, such person may maintain, in his own name, any action thereon which he might maintain in case it had been made with him only, and the consideration had moved from him to the party making such covenant or promise.

(Emphasis added).  "The foregoing statute expressly allows a person who is not a party to a contract to maintain a cause of action arising from that contract only if it was made for his or her 'sole benefit.'" *E. Steel Constructors, Inc. v. City of Salem*, 549 S.E.2d 266, 277 (W. Va. 2001).  In determining whether a plaintiff is a third-party beneficiary of a contract, the West Virginia Supreme Court of Appeals held that:

> In the absence of a provision in a contract specifically stating that such contract shall inure to the benefit of a third person, there is a presumption that the contracting parties did not so intend and in order to overcome such presumption the implication from the contract as a whole and the surrounding circumstances must be so strong as to be tantamount to an express declaration.

*Id.* (citing Syl. Pt. 2, *Ison v. Daniel Crisp Corp.*, 122 S.E.2d 553 (W. Va. 1961)).

Flagstar argues it is an intended beneficiary because the arbitration clause states that any dispute related to the property or the Agreement must be resolved by arbitration.  Flagstar has failed to direct this Court to any language in the contract between DRB and Plaintiffs that either expressly or impliedly declares an intent that the contract was for Flagstar's *sole* benefit.  Therefore, Flagstar was not an intended beneficiary of the Agreement of Sale.

Next, Flagstar argues that it is required to participate in any arbitration

30

proceedings because DRB and Monocacy have pending cross-claims against Flagstar. DRB and Monocacy allege a right to contribution and indemnification should Plaintiffs succeed in proving damages against DRB and Monocacy.  Flagstar argues that fairness and judicial economy favor that arbitration include all parties to this action. Flagstar also contends that Plaintiffs' claim against it arises out of the contract.

The Federal Arbitration Act "reflects 'a liberal federal policy favoring arbitration agreements.'" *Adkins*, 303 F.3d at 500 (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S.at 24, 103 S. Ct. 927).  When determining whether an issue is arbitrable pursuant to a contractual provision, courts are required to "resolve 'any doubts concerning the scope of arbitrable issues . . . in favor of arbitration.'" *Hill v. PeopleSoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S.at 24-25, 103 S. Ct. 927).

Additionally, under extraordinary circumstances, a district court may send nonsignatory defendants to arbitration if the defendants "are inexorably intertwined with and dependent upon the claims brought against the defendants who have moved to compel arbitration."  *Holmes*, 2012 WL 3647674, at *12-13.  In that case, the Court ordered claims against nonsignatory defendants to be referred to arbitration in the "interests of efficiency, avoidance of possible conflicting judgments and obligations, and the high possibility of the inability to reach a full and complete result in arbitration should all defendants not participate in those proceedings . . . ." *Id.* at *13.  In this case, Plaintiffs' claim against Defendant Flagstar is intertwined with the other claims as the same facts and witnesses will necessarily be required to determine Plaintiffs' claim

31

against Flagstar and Plaintiffs' claims against the remaining defendants.  Importantly, Plaintiffs' claims against DRB and Monocacy have been ordered to arbitration.  DRB and Monocacy have filed claims for contribution and indemnification against Flagstar.  Thus, if Flagstar is not ordered to arbitration, it may be unable to protect its interests and may result in conflicting judgments and obligations.  Accordingly, the interdependent and intertwined nature of Plaintiffs' claims with all of the defendants, the interests of efficiency, avoidance of possible conflicting judgments and obligations, and the high possibility of the inability to reach a full and complete result in arbitration should all defendants not participate in those proceedings, mandate that all claims against all defendants be litigated together.

## IV.  Conclusion

For the reasons stated above, this Court finds that Defendant's Motion to Dismiss Plaintiff's Complaint or in the alternative, Motion to Compel Arbitration [Doc. 28] should be, and hereby is, **GRANTED**.  Accordingly, Plaintiffs' claims against Defendants Dan Ryan Builders, Inc., Monocacy Home Mortgage, LLC, Flagstar Bank, F.S.B., and Jay Kimmel are hereby **STAYED** and **SUBMITTED TO ARBITRATION** in accordance with Paragraph 19 of the Agreement of Sale.  The parties are **DIRECTED** to notify this Court forthwith upon the conclusion of the matter.

It is so **ORDERED**.

The Clerk is hereby directed to transmit copies of this Order to all counsel of record herein.

32

**DATED:** July 3, 2013

GINA M. GROH
UNITED STATES DISTRICT JUDGE